## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-0815

STUART PATRICK MCLANEY,

     Plaintiff,

v.

EL PASO COUNTY, COLORADO,
WELLPATH, LLC,
H.I.G. CAPITAL, LLC,
JOSEPH ROYBAL, in his individual and official capacities,
SANDRA RINCON, in her individual capacity,
DYLAN COX, in his individual capacity,
KAYLA WHIGHAM, in her individual capacity,
DONIELLE CODDINGTON, in her individual capacity,
GEORGE SANTINI, in his individual capacity,
ANTHONY LUPO, in his individual capacity,
ZOE ROCHE, in her individual capacity,
EVIE DECKER, in her individual capacity,
NICOLE CARROLL, in her individual capacity,
PAM DOBYNS, in her individual capacity,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Stuart Patrick McLaney, by and through his attorneys Andy McNulty, Mari Newman, and Madeline Leibin of NEWMAN | MCNULTY, LLC, respectfully alleges as follows:

### INTRODUCTION

1.    Stuart Patrick McLaney has chronic myeloid leukemia ("CML"), a type of cancer involving the uncontrolled, irregular production of white blood cells in an individual's bone marrow. Mr. McLaney has had CML for over three years. Thankfully, since the introduction of

1

tyrosine kinase inhibitor ("TKI") chemotherapy in 2001, CML is a manageable chronic condition. To keep his cancer from progressing and becoming life-threatening, Mr. McLaney simply needs to take a daily oral TKI chemotherapy pill, which he has been prescribed. But without that medication, Mr. McLaney faces immediate and irreversible health impacts, including the pain of his cancer's progression and, ultimately, a shorter life expectancy.

2.      Mr. McLaney entered the Defendant El Paso County Criminal Justice Center ("CJC") on March 23, 2023. From the moment of his arrival, he alerted the Defendant El Paso County sheriff's deputies and Defendant Wellpath, LLC ("Defendant Wellpath") staff that he needed his medication.

3.      But that day, and every day after, Defendant El Paso County sheriff's deputies and Defendant Wellpath staff consciously and intentionally denied Mr. McLaney his medication. They denied Mr. McLaney his medication despite his numerous pleas communicating both about his immense pain and long-term health risks, and their own documentation thereof.

4.      After four months in the CJC, Mr. McLaney was released on July 24, 2023. He immediately resumed taking his medication. But, to understandably deep devastation, Mr. McLaney learned that the time without medication had an adverse effect on his life expectancy.

5.      Mr. McLaney's injuries were directly caused by the actions and inactions of Defendant El Paso County sheriff's deputies and Defendant Wellpath staff.

6.      Mr. McLaney brings this lawsuit to hold Defendant El Paso County, Defendant Wellpath, and the Individual Defendants accountable for their flagrant violations of his federal and state constitutional and statutory rights. Without accountability, Defendant El Paso County, Defendant Wellpath, and the Individual Defendants will carry on with their indifference toward human suffering.

## JURISDICTION AND VENUE

7.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

8.     Jurisdiction supporting Plaintiff's claim for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988.

9.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

10.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

## PARTIES

11.     At all times relevant to the subject matter of this litigation, Stuart Patrick McLaney has been a citizen of the United States and a resident of, and domiciled in, the State of Colorado.

12.     Defendant El Paso County, Colorado is a municipality and as such is a proper defendant under 42 U.S.C. § 1983.

13.     Defendant Wellpath is a Delaware limited liability company doing business in Colorado. Its principal office street address is 1283 Murfreesboro Pike, Ste. 500, Nashville, TN 37217. Its registered agent is Corporate Creations Network Inc., 155 E. Boardwalk, #490, Ft. Collins, CO 80525. Defendant Wellpath was created by its parent entity, the private equity group H.I.G. Capital, after H.I.G. Capital acquired jail medical contractor Correct Care Solutions, LLC, ("CCS") in 2018. Shortly thereafter, CCS and another jail medical contractor, Correctional

Medical Group Companies, were merged, by the parent H.I.G. Capital, to form Defendant Wellpath.[1]

14.    At all times relevant, Defendant Wellpath contracted with Defendant El Paso County to provide medical and mental health care at the CJC. Defendant Wellpath is sued vicariously for the negligence and constitutional violations of its employees and directly for its own deliberate indifference, and negligent training, staffing, and supervision of staff working at the CJC. Defendant Wellpath is a private corporation not entitled to immunity under the Colorado Governmental Immunity Act or any other law.

---

[1] Plaintiff contends that institutional standards of liability based on respondeat superior should apply to private entities, such as Defendant Wellpath, in §1983 actions, and that cases such as *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) are wrongly decided and should be modified or reversed. *See Shields v. Ill. Dep't of Corr.,* 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional rights."). Applying the heightened standards of *Monell* — designed to protect governmental entities — to private corporate conduct is contrary to public policy, including policy concerns outlined by the Supreme Court in *Monell* and its progeny. Several district courts in the Tenth Circuit have acknowledged *Shields*'s criticism of the application of *Monell* to private corporations. *See, e.g.,* *Sanders v. Glanz,* 138 F. Supp. 3d 1248, 1255 n.3; *Khan v. Barela,* No. 15-cv-1151 MV/SMV, 2021 U.S. Dist. LEXIS 5596, at *11 n.13 (D.N.M. Jan. 12, 2021). In *Herrera v. Santa Fe Public Schools,* the District Court of New Mexico discussed *Shields,* acknowledging that "[t]here is a fair question whether this is a wise rule." 41 F. Supp. 3d 1027, 1179 (D.N.M. 2014). In *Revila v. Glanz,* the Northern District of Oklahoma stated that *Shields*' reasoning "provides potent arguments for *not* extending *Monell* to private corporations" but stated that it must follow Tenth Circuit precedent, which holds that "*Monell* extends to private corporations and thus [private corporations] cannot be held liable on a *respondeat superior* basis for their employees' conduct." 8 F. Supp. 3d 1336, 1341 (N.D. Okla. 2014). While several opinions throughout the Tenth Circuit question the soundness of extending *Monell* to private corporations, these opinions also acknowledge that it currently remains settled law. *See Carr v. Elder,* 2022 U.S. Dist. LEXIS 247870, *19-20 (D. Colo. Sept. 30, 2022). In any event, Defendants in this matter are all legally culpable, including Defendant Wellpath, whichever standard of institutional liability is applied.

15.     Defendant H.I.G. Capital, LLC, is a private equity firm doing business in Colorado. It is the owner, manager, and partner of Defendant Wellpath. It contracts to provide delivery of medical and mental health services to inmates and was (and is) responsible for the management, hiring, retaining, training, and supervising of the conduct, policies and practices, customs, standards, finances, of its employees, managers, supervisors, contractors, leaders in the service of providing medical and mental health care to inmates at the CJC. Defendant Wellpath executives, directors, supervisors, staff, and mental health providers act on behalf of H.I.G. Capital. H.I.G. Capital is the agent and alter ego of Defendant Wellpath, and/or alternatively Defendant Wellpath acts on behalf of H.I.G. Capital which has control over it. H.I.G. Capital is a private corporation not entitled to immunity under the Colorado Governmental Immunity Act or any other law.

16.     At all times relevant to the subject matter of this litigation, Defendant Sheriff Joseph Roybal was a citizen of the United States and a resident and domiciled in the State of Colorado. At all relevant times, Defendant Roybal was acting under color of state law and within the scope and course of his duties and employment in his capacity as the Defendant El Paso County Sheriff. Defendant Roybal is subject to suit under C.R.S. § 13-21-131.

17.     At all times relevant to the subject matter of this litigation, Defendant George Santini was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law and within the scope and course of his duties and employment in his capacity as a physician employed and/or contracted by Defendant Wellpath to provide medical services at the CJC.

18.     At all times relevant to the subject matter of this litigation, Defendant Anthony Lupo was a citizen of the United States and a resident of and domiciled in Colorado and was acting

under color of state law and within the scope and course of his duties and employment in his capacity as a nurse employed and/or contracted by Defendant Wellpath to provide medical services at the CJC.

19. At all times relevant to the subject matter of this litigation, Defendant Zoe Roche was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law and within the scope and course of her duties and employment in her capacity as a nurse employed and/or contracted by Defendant Wellpath to provide medical services at the CJC.

20. At all times relevant to the subject matter of this litigation, Defendant Evie Decker was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law and within the scope and course of her duties and employment in her capacity as a nurse employed and/or contracted by Defendant Wellpath to provide medical services at the CJC.

21. At all times relevant to the subject matter of this litigation, Defendant Nicole Carroll was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law and within the scope and course of her duties and employment in her capacity as a nurse employed and/or contracted by Defendant Wellpath to provide medical services at the CJC.

22. At all times relevant to the subject matter of this litigation, Defendant Pam Dobyns was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law and within the scope and course of her duties and employment in her capacity as a nurse employed and/or contracted by Defendant Wellpath to provide medical services at the CJC.

23.     At all times relevant to the subject matter of this litigation, Defendant Deputy Sandra Rincon was a citizen of the United States and a resident and domiciled in the State of Colorado. At all relevant times, Defendant Rincon was acting under color of state law and within the scope and course of her duties and employment in her capacity as an Defendant El Paso County sheriff's deputy. Defendant Rincon is subject to suit under C.R.S. § 13-21-131.

24.     At all times relevant to the subject matter of this litigation, Defendant Deputy Dylan Cox was a citizen of the United States and a resident and domiciled in the State of Colorado. At all relevant times, Defendant Cox was acting under color of state law and within the scope and course of his duties and employment in his capacity as an Defendant El Paso County sheriff's deputy. Defendant Cox is subject to suit under C.R.S. § 13-21-131.

25.     At all times relevant to this litigation, Defendant Deputy Kayla Whigham was a citizen of the United States and a resident and domiciled in the State of Colorado. At all relevant times, Defendant Whigham was acting under color of state law and within the scope and course of her duties and employment in her capacity as an Defendant El Paso County sheriff's deputy. Defendant Whigham is subject to suit under C.R.S. § 13-21-131.

26.     At all times relevant to this litigation, Defendant Deputy Donielle Coddington was a citizen of the United States and a resident and domiciled in the State of Colorado. At all relevant times, Defendant Coddington was acting under color of state law and within the scope and course of her duties and employment in her capacity as an Defendant El Paso County sheriff's deputy. Defendant Coddington is subject to suit under C.R.S. § 13-21-131.

27.     Defendants Roybal, Rincon, Cox, Whigham, and Coddington are referred to as "Defendant Deputies." Defendant Deputies and Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns are together referred to as "Individual Defendants."

## CERTIFICATE OF REVIEW PURSUANT TO C.R.S. § 13-20-602

28.    Pursuant the requirements set forth in C.R.S. §13-20-602(3)(a)(I), Plaintiff certifies that he consulted a person with expertise in the area of the alleged negligent conduct by Defendants as alleged in this Complaint. Pursuant to the requirements set forth in C.R.S. §13-20-602(3)(a)(II), the person consulted by Plaintiff reviewed the known facts, including any records, documents and other materials found to be relevant (and currently available) to the allegations of negligent conduct. Based on the review of these facts, the person consulted concluded that the filing of the claim does not lack substantial justification within the meaning of C.R.S. §13-17-102(4), as to the existence of a duty, a breach of that duty, causation, and damages, where the Defendants' conduct fell below the standard of care appropriate to the profession.

## FACTUAL ALLEGATIONS

### Mr. McLaney repeatedly alerted Defendant El Paso County sheriff's deputies and Defendant Wellpath staff that he had CML and needed his medication.

29.    Mr. McLaney has had CML, a type of cancer, for over three years. To keep his cancer from progressing and becoming life-threatening, Mr. McLaney simply needs to take a daily oral TKI chemotherapy pill, which he has been prescribed. Without that medication, Mr. McLaney faces immediate and irreversible health impacts, including the pain of his cancer's progression and, ultimately, a shorter life expectancy.

30.    Mr. McLaney is, as he must be, very attuned to his CML. Mr. McLaney goes to the University of Colorado Health Memorial Hospital Oncology Center ("Memorial Oncology Center") every three months. As a part of that routine, Mr. McLaney had a doctor's appointment on March 20, 2023. At that appointment, Mr. McLaney was prescribed a different daily oral TKI chemotherapy pill, scemblix (asciminib), than the one he had been taking. Other than the difference in specific TKI chemotherapy pill, his treatment plan, including other medication for control of

8

CML-related symptoms, such as iron deficiency, was to remain the same, and Mr. McLaney was to remain diligent about it. Mr. McLaney planned to do so.

31.    Mr. McLaney was arrested on March 22, 2023, at approximately 6:46 p.m.

32.    When Mr. McLaney was booked into the CJC during the early morning hours on March 23, 2023, he immediately alerted Defendant Deputy Sandra Rincon that he needed to take his oral TKI chemotherapy pill, scemblix, daily, among other medication, pursuant to his treatment plan.

33.    Hours later, around 5:00 a.m. on March 23, 2023, during the medical intake process, Mr. McLaney relayed the same information to Defendant Anthony Lupo. Specifically, Mr. McLaney told Defendant Lupo that he had CML and that he was seen by his doctor at the Memorial Oncology Center just three days ago. He told Defendant Lupo that he needed to take his life-saving oral TKI chemotherapy pill, scemblix, daily, among other medication, pursuant to his treatment plan. He requested immediate action in order to ensure he would not disrupt his treatment plan.

34.    Mr. McLaney signed all necessary forms, such as releases of information, in order for the Defendants to receive his treatment plan information from the Memorial Oncology Center.

**Defendant El Paso County sheriff's deputies and Defendant Wellpath staff abjectly refused to provide Mr. McLaney with his critical medication.**

35.    Neither Defendant Rincon nor Defendant Lupo ever followed up with Mr. McLaney to ensure he received his medication. Mr. McLaney became distressed about the lack of follow up and the progression of his untreated CML.

36.    It was not until a full *seven days later* that, on March 29, 2023, around 11:18 a.m., that Defendant George Santini saw Mr. McLaney. Mr. McLaney told Defendant Santini about his CML and voiced his concerns about its progression. He gave Defendant Santini all of the specific

information about his treatment plan, including that he took the daily oral TKI chemotherapy pill, scemblix (asciminib), as well as other medication for control of CML-related symptoms, such as iron deficiency. In his notes, Defendant Santini acknowledged that Mr. McLaney informed him that he needed his daily oral TKI chemotherapy pill and other medication. Despite this, Defendant Santini did not, at any point, take any action to ensure that Mr. McLaney was provided any of his critical medication.

37.    For days and days and days, Mr. McLaney did not hear receive any word about his follow up regarding his treatment plan from any of the Defendant El Paso County sheriff's deputies or Defendant Wellpath staff. He became even more deeply concerned about the progression of his CML, untreated. And he began to experience immense pain.

38.    Mr. McLaney took the only measures he could: he asked after his treatment plan and followed up at every opportunity. This included sending numerous grievances articulating his need for his medication and related health measures.

39.    For instance, on April 16, 2023, almost a month after his entry to the CJC, he communicated via grievance: "I have CML lukemia I'm not getting any of my meds . . . I have stage two bone cancer. I signed a release of info for my medical records from UC Mimoral [sic] . . . all this info should be able to be seen. I need my meds ASAP." Mr. McLaney did not receive a response.

40.    The next day, April 17, 2023, he followed up, relaying "I'm feeling bad. I'm hurting more and more every hour it feels like. I'm getting weaker. I'm not getting any of my pain meds my iron meds or my bone meds or most important my chemo. I can feel my spleen swlloning [sic] in me I'm in a lot of pain. My whole body is hurting now." Despite the emergent nature of these symptoms, no Defendant El Paso County sheriff's deputy or Defendant Wellpath staff responded

10

until *three days later*. And when they did, Defendant Deputy Dylan Cox merely relayed that "Medical does not give out dates or times for appointments." Despite being aware that Mr. McLaney needed his life-saving daily oral TKI chemotherapy pill and other critical medicine, Defendant Cox took no actions to ensure that Mr. McLaney was provided any of his medicine. This left Mr. McLaney in even more distress.

41.    Nine days later, on April 26, 2023, around 10:43 a.m., Mr. McLaney was finally seen by a Defendant Wellpath nurse. Defendant Zoe Roche conducted a medical history and physical assessment with mental health evaluation — seemingly, this was Mr. McLaney's first substantive post-screening assessment. It was unclear to Mr. McLaney whether Defendant Roche's assessment was in any way responsive to Mr. McLaney's consistent communications.

42.    During his assessment with Defendant Roche, Mr. McLaney highlighted that he had been at the CJC for *over a month*, and that despite regularly alerting Defendant El Paso County sheriff's deputies and Defendant Wellpath staff about: (1) his CML, (2) his need for daily medication pursuant to the treatment plan provided to him by his oncologist, and (3) despite his immediate pain and devastating long-term outcomes, that (4) he had still not been given any medication. He described how he felt his spleen was becoming enlarged and he was having problems sleeping. But in face of Mr. McLaney's reports of symptoms of such an emergent nature and her documentation thereof, Defendant Roche merely gave Mr. McLaney a second release of information to complete, told him about the grievance process, and vaguely stated that there would be follow-up. Despite being aware that Mr. McLaney needed his critical life-saving daily oral TKI chemotherapy pill and other critical medicine, Defendant Roche took no actions to ensure that Mr. McLaney was provided any of his medicine.

43.     On information and belief, following Defendant Roche's assessment, neither Defendant Santini nor Defendant Roche took any additional actions to ensure that Mr. McLaney was provided his daily oral TKI chemotherapy pill or other critical medicine.

44.     On May 2, 2023, Mr. McLaney submitted a grievance explicitly stating that he had been there for over *forty* days and still had not gotten his medication. He explicitly noted "I have CML I can feel my spleen swollen I'm in a lot of pain." Despite these emergent symptoms, Mr. McLaney was not seen until the next day, around 12:46 p.m. During the appointment, Mr. McLaney again told Defendant Santini that he needed his medicine and described the symptoms he was suffering without it. Defendant Santini's notes acknowledge that it had been forty days that Mr. McLaney had been without his life-saving daily oral TKI chemotherapy pill and other critical medication. Despite being aware that Mr. McLaney needed his critical daily chemotherapy medicine, Defendant Santini still took no action to ensure that Mr. McLaney was provided his critical daily oral TKI chemotherapy pill or other critical medicine.

45.     On May 5, 2023, around 3:33 p.m., Defendant Evie Decker saw Mr. McLaney for a mental health initial assessment. Mr. McLaney, distressed about the progression of his CML, untreated, used the opportunity to raise, again, his need for his medication. He described how he had signed all necessary forms, such as a release of information to Memorial Oncology Center, twice, and had submitted numerous grievances to date, all to no avail. Defendant Decker did not prioritize Mr. McLaney's untreated CML; she instead focused on his general mental health. But even included in Mr. McLaney's mental health self-reporting was his concern he would not be able to handle the mental health impacts of his progression of his CML while incarcerated. Defendant Decker indicated in her assessment that his "terminal/incurable medical illness or pain" was a risk factor. But nothing in her assessment raised the emergent need to get Mr. McLaney his

life-saving medication. Despite being aware that Mr. McLaney needed his critical daily chemotherapy medicine, Defendant Decker did not take any action to ensure that Mr. McLaney was provided his life-saving daily oral TKI chemotherapy pill or other critical medicine.

46.    The next day, May 6, 2023, Mr. McLaney followed up again with another grievance. He explicitly stated that he had CML and said he had been there "since March 23 and still have not recived [sic] my chemo or any of my meds. I can feel myself getting sicker every day." He asked for a vegetarian diet to get more nutrients given his CML. He further noted that he had directed his communications to medical staff, to no avail. In an obviously inattentive response, Defendant Deputy Kayla Whigham again directed Mr. McLaney to address his grievance to medical staff. Despite being aware that Mr. McLaney needed his critical daily chemotherapy medicine, Defendant Whigham did not take any action to ensure that Mr. McLaney was provided his life-saving daily oral TKI chemotherapy pill or other critical medicine.

47.    The next day, on May 7, 2023, Mr. McLaney sought a "medical mat," expressing that, due to the immense pain from his untreated CML, "it's really hard for me to lay on this mat as bad as I'm hurting." Defendant Roche did not respond until *three days later*, with only the statement that "Medical does not provide special mattresses." Despite being aware that Mr. McLaney needed his life-saving daily oral TKI chemotherapy pill and other critical medicine, Defendant Roche did not take any action to ensure that Mr. McLaney was provided any of his medicine.

48.    Two days later, on May 9, 2023, Mr. McLaney followed up again to reiterate his request for vegetarian meals, clarifying "I'm asking for my proper diet cuz I'm not receving [sic] my proper meds for my stage two lukemia. Please help." Three days later, Defendant Deputy Donielle Coddington responded to alert him that his request for a vegetarian diet was denied, with

a note that "Medical does not offer a vegetarian diet unless medically necessary." His untreated CML was not mentioned. Despite being aware that Mr. McLaney needed his life-saving daily oral TKI chemotherapy pill and other critical medicine, Defendant Coddington did not take any action to ensure that Mr. McLaney was provided any of his medicine.

49.    Three days later, on May 12, 2023, Mr. McLaney followed up again. He again expressed he was in "stage 2 lukemia and not receiving any of my meds," so his diet took on even more significance. Mr. McLaney received a response advising him to direct dietary requests to another recipient. None of the Individual Defendants took any action to provide Mr. McLaney any of his medicine in response to his grievance.

50.    On May 18, 2023, almost three months since he had arrived to CJC, Mr. McLaney was finally taken for an appointment outside of CJC. He was taken to the University of Colorado's Health Cancer Care and Hematology Department. There, Mr. McLaney shared how he had not been given his medication at the CJC, and that he had experienced pain including his joints hurting. After receiving his medical history in detail, the medical professional duly noted that Mr. McLaney was taking a daily oral TKI chemotherapy pill, scemblix (asciminib), among other medication, and needed to continue that treatment plan. Despite it being clear after this appointment that Mr. McLaney needed his life-saving daily oral TKI chemotherapy pill and other critical medicine, none of the Individual Defendants took any action to ensure that Mr. McLaney was provided any of his medicine.

51.    Days later, on May 21, 2023, Mr. McLaney still had not received his medication and experienced concerning symptoms. He submitted a grievance and that he had "been getting really short of breath a lot of times thorough out [sic] the day." Despite the emergent nature of these symptoms, Defendant Nicole Carroll did not respond until *eight days later*, to relay he was

14

scheduled for a nurse sick call that "should be this week." Despite being aware that Mr. McLaney needed his life-saving daily oral TKI chemotherapy pill and other critical medicine, Defendant Carroll did not take any action to ensure that Mr. McLaney was provided any of his medicine.

52.     Five days later, on May 26, 2023, Mr. McLaney alerted Defendant El Paso County sheriff's deputies and Defendant Wellpath staff and submitted a grievance communicating that had not yet seen any medical professionals and was still, concerningly, "having problems breathing . . . getting short of breath" and was becoming lightheaded. He explicitly said he was "Pretty sure it has something to do with my CML lukemia." Again, despite the emergent nature of these symptoms, Mr. McLaney was not seen until *four days later*, on May 30, 2023, by Defendant Santini. None of the Individual Defendants, including Defendant Santini, took any action to provide Mr. McLaney his life-saving daily oral TKI chemotherapy pill or other critical medicine in response to his grievance.

### Mr. McLaney understood that the abject refusal to provide him with his critical medication was a cost-saving measure by Defendants El Paso County, Roybal, and Wellpath.

53.     After his appointment outside of the CJC, Mr. McLaney waited for his medication for weeks. He asked multiple times, but never got any information on whether, and if so, when, he would receive it. In the interim, he continued to experience immense pain and distress.

54.     Around this time, once, while he was waiting in the hall, he heard some of the Defendant Wellpath staff discussing it, and heard one unidentifiable individual say that it was just too expensive.

55.     Weeks later, on June 13, 2023, Defendant Pam Dobyns acknowledged to Mr. McLaney that she knew his CML needed to be treated, but that there was an insurance problem while he was at CJC. Defendant Dobyns further noted that because it was a different daily oral

TKI chemotherapy pill, scemblix (asciminib), than he had been on in the past, it might require special monitoring that they were unequipped to provide at the CJC.

56.     Defendant Dobyns indicated in her notes that she had spoken to the CJC management about Mr. McLaney's situation. Upon information and belief, Defendant Dobyns spoke to Defendant Roybal about Mr. McLaney's situation. Despite being aware that Mr. McLaney needed his critical daily chemotherapy medicine, neither Defendant Roybal nor Defendant Dobyns took any action to ensure that Mr. McLaney was provided his life-saving daily oral TKI chemotherapy pill or other critical medicine.

57.     Weeks after his original request, Defendant Dobyns permitted Mr. McLaney to have a vegetarian diet. Despite his continued communications to Defendant Dobyns and other Defendant El Paso County sheriff's deputies and Defendant Wellpath staff about his CML and the immediate and long-term consequences of it going untreated, Mr. McLaney was still not given his medication.

58.     After four months in the CJC, Mr. McLaney was released on July 24, 2023. He was not once given his life-saving daily oral TKI chemotherapy pill or other critical medicine while he was at the CJC.

### Because of the deliberate indifference of Defendant El Paso County sheriff's deputies and Defendant Wellpath staff, Mr. McLaney suffered significant injuries.

59.     Upon his release from the CJC, Mr. McLaney immediately resumed taking his life-saving medication. But the four months without it had devastating impacts. It is well-established that lapses in treatment of CML are associated with less favorable health outcomes, which, in the context of cancer, means a shorter life expectancy. *See, e.g.*, Shah, *Chronic Myeloid Leukemia,*

*Clinical Practice Guidelines in Oncology Version 2.2024*, Nat'l Comprehensive Cancer Network Journal, https://pubmed.ncbi.nlm.nih.gov/38394770/.

60.    Furthermore, Mr. McLaney experienced immense physical pain and severe emotional distress during his four months at the CJC. And he continues to experience dread about his CML progression that he would not have but for the lapse in his treatment caused by the deliberate indifference of the Defendants.

### Defendants El Paso County, Roybal, and Wellpath failed to adequately train and supervise their officials.

61.    Defendants El Paso County, Roybal, and Wellpath failed to adequately train their officials on the importance of providing critical medication to inmates immediately upon arrival and across their time at the CJC, and failed to adequately supervise their officials to ensure that inmates booked into and held by the CJC receive their critical medication.

62.    Defendant Roybal was responsible for training and supervising the Individual Defendants; for setting jail policy; for leading the overall management of the jail; and for ensuring the health and welfare of all inmates detained in the CJC.

63.    Defendants El Paso County, Roybal, and Wellpath failed to adequately train and supervise their officials in such a way that it amounted to deliberate indifference to the obvious, serious medical needs of inmates who require critical medication.

64.    Defendants El Paso County, Roybal, and Wellpath failed to adequately train and supervise their officials, which constituted deliberate indifference to Mr. McLaney's serious medical needs because it was obvious that such failures would cause inmates like Mr. McLaney to suffer serious immediate and long-term injuries.

65.    Financial (profit-driven) considerations were a motivating factor in Defendants El Paso County's, Roybal's, and Wellpath's failures to adequately train and supervise their officials.

66.    Customarily, within the CJC, it is common for inmates to be denied their critical medication upon intake into and across their time at within the CJC.

**Defendant El Paso County has customs, policies, and practices of providing unconstitutional, deliberately indifferent care.**

67.    On July 3, 2020, Shawn Meehan was found hanging in his cell. He had a reported history of mental health issues, but the intake process at the CJC was recklessly insufficient. On June 13, 2020, Mr. Meehan had submitted a kite to medical at the CJC asking for help and saying he wanted to hurt himself, but as part of a continuing pattern of deliberate indifference, no alerts or precautions were started by any Defendant El Paso County officials, and he was not placed on suicide watch before he died.

68.    Adison Reed was booked into the CJC on September 3, 2021. Defendant El Paso County officials were aware that Mr. Reed was diabetic based on a previous incarceration but deprived him of necessary diabetic care and treatment. By September 8, 2021, Mr. Reed was in extreme diabetic ketoacidosis, a life-threatening condition that results from a lack of insulin. He was finally transported to the hospital, and died 19 days later, on September 27, 2021. Defendant El Paso County officials were deliberately indifferent in Mr. Reed's intake screening and care planning. Defendant El Paso County officials allowed his medical condition to devolve to the point of extreme diabetic ketoacidosis as part of their pattern of refusing to respond to obviously critical changes in medical condition until the person is dead.

69.    Cristo Canett died a gruesome, painful, and entirely preventable death while incarcerated in the CJC. Mr. Canett took himself to the emergency room because of his severe back and flank pain. He was recklessly arrested at the hospital after he was triaged and waiting to be taken back to see the nurses and doctor. When Mr. Canett arrived at the CJC, without having been medically evaluated at the emergency department, his pain had grown worse, spreading to

his abdomen and right shoulder. Mr. Canett told Defendant Wellpath staff at the jail about his new emergency symptoms of abdominal and shoulder pain, asking to see a nurse and doctor. Mr. Canett's pain became so bad he needed a wheelchair. He was pale, clammy, had labored breathing, shortness of breath, and was in obvious severe pain and medical distress. Deputies called the jail medical unit for help several times, but Defendant Wellpath staff did nothing in response. They did not send him to the hospital where they knew he had tried to go the day before when he was arrested. They did not even call a doctor to report these abnormal symptoms. No nurse or doctor ever assessed or treated Mr. Canett at the jail. Mr. Canett was suffering from a duodenal ulcer, which perforated early in the morning on April 26, 2022, causing him to internally bleed to death on the floor of his cell. Defendant Wellpath and its staff's deliberate indifference to his medical needs caused his death.

70.    On September 27, 2021, William Johnson suffered a fatal seizure in the CJC after spending a month pleading to receive the prescription medications that he brought to the CJC with his doctor's current orders and letters warning of the dangers of withdrawal if his medications were not provided. Defendant El Paso County officials conducted a cursory intake assessment, and then abruptly discontinued four of Mr. Johnson's necessary mental health and anti-seizure prescriptions with no medical basis, and without consulting with his prescribing doctor. Without his medications, Mr. Johnson decompensated, became severely anxious, could not sleep, lost touch with reality, and suffered a complete mental breakdown. Instead of helping him, Defendant El Paso County officials punitively placed him in solitary confinement where he continued not to receive his medications, including those for seizure prevention. Although Mr. Johnson had a known, major unexplained change in mental status and was severely incapacitated, he was not sent to the hospital. He spent the last week of his life disoriented, alone, and begging for medications,

before dying of a seizure in solitary confinement. Defendant El Paso County's deliberate indifference caused his death.

71.    On March 16, 2022, Laura Gibbs told Defendant El Paso County sheriff's deputies that she was not feeling well and having panic attacks. Defendant El Paso County sheriff's deputies told medical, and a nurse said she would see her. Later that day, Defendant El Paso County sheriff's deputies again told medical that Ms. Gibbs wasn't feeling well, but medical refused to come. Later still, Defendant El Paso County sheriff's deputies called medical a third time and she was finally seen. Ms. Gibbs' medical issues continued into the morning of March 17, 2022. At approximately 9:00 a.m., when medical staff came to her unit to pass out medications, Defendant El Paso County sheriff's deputies asked them to see Ms. Gibbs. She told medical that she was withdrawing from heroine and was experiencing nausea, diarrhea, the shakes, and was hot and cold. Medical staff merely responded that they would make note of her problems and would come back to see her. Medical staff did not come back or provide any medication to address Ms. Gibbs' worsening condition even though all jail staff know these withdrawal symptoms can be fatal in drug users if not treated. Predictably, later that day, Ms. Gibbs was found unresponsive and declared dead shortly thereafter. She died because of the deliberate indifference of Defendant El Paso County officials and Defendant Wellpath staff.

72.    Defendant El Paso County officials failed to screen, care plan, and provide necessary medications and treatment to 32-year-old Princeton Jackson, who was paralyzed from a prior spinal cord injury with extremely limited use of his atrophied lower extremities. To urinate, Mr. Jackson requires a catheter and lubricant; to have a bowel movement, he requires an enema, all of which was well understood by Defendant El Paso County officials. Nevertheless, Defendant El Paso County officials forced Mr. Jackson to ration catheters, leaving him without any means to

relieve his bladder for extremely long periods of time. Adding injury to injury, the limited supply of catheters Mr. Jackson was given were the wrong size, causing extreme pain every time he inserted or removed a wrong-sized catheter, as well as discharge of chunks of tissue and blood. Defendant El Paso County officials also refused to allow Mr. Jackson access to cheap and readily available enema supplies. Instead, they forced Mr. Jackson to digitally remove his own feces. Despite numerous requests for medical care and to be seen by a provider, he was effectively ignored. During his 72-day detention, Mr. Jackson fell victim to severe staffing issues at the CJC, often going hours without being able to urinate, developing infections, constipation, diarrhea, and fecal impaction. He also was denied his prescription, gabapentin, which he needed to alleviate severe nerve pain and duloxetine, for his depression and PTSD caused by his prior accident. Even one of the Defendant El Paso County medical staff was frustrated enough with the understaffing at CJC that he documented on Mr. Jackson's medical charts, in connection with one of Mr. Jackson's missed dosages on March 6, 2022, that the "medication was not given due to critical staffing, only having one person to pass meds for the entire jail."

73.    In June of 2022, Dezeree Archuleta died from suicide in the CJC after she was denied her critical mental health medications. Ms. Archuleta had a well-documented history of mental health issues. Despite ongoing, obvious, and well-known signs of suicidality, Ms. Archuleta was taken off of suicide watch. Ms. Archuleta asked to be provided medication that she had previously been provided, but Defendant El Paso County officials and Defendant Wellpath staff refused to provide her with medication. Over the course of her incarceration, Ms. Archuleta's situation deteriorated significantly. She relayed her situation, including her suicidal and self-harm ideations and visual hallucinations to Defendant El Paso County officials and Defendant Wellpath staff. And she requested medication to help with her situation, including her depression, from

Defendant El Paso County officials and Defendant Wellpath staff. Defendant El Paso County officials and Defendant Wellpath staff merely responded that she should try to take her mind off things. Even after she was found naked and punching herself in the face, she was placed in a restraint chair but, recklessly, this known worsening of her condition did not prompt transfer to a hospital or advanced level psychiatric care. On June 8, 2022, Defendant El Paso County officials and Defendant Wellpath staff removed Ms. Archuleta from suicide watch. The only reason given for taking Ms. Archuleta off of suicide watch was that she had been "bopping back and forth" between being on suicide watch and being off of suicide watch. The next day, Ms. Archuleta was noted to have a blunted affect and change in her presentation. She told Defendant El Paso County officials and Defendant Wellpath staff she was suicidal, but again was not transferred or provided any higher-level mental health care. She was callously told to simply "use her coping skills." Ms. Archuleta was found dead hanging from a vent grate by a torn strip of clothing in her cell later that day.

74.    On July 3, 2022, Cassandra Ramirez died from drug-related issues in the CJC. That day, Ms. Ramirez's symptoms had caused her to urinate and defecate on herself. Later that day, she was humming at Defendant El Paso County sheriff's deputies and fluttering her eyes. Defendant El Paso County officials refused to address these serious obvious symptoms, leaving Ms. Ramirez to die near midnight on July 3, 2022.

75.    Daniel Murray died of alcohol related conditions and withdrawal seizures while incarcerated at the CJC in July of 2022. While he was in "chem dep," which is how the CJC staff often refer to the medical's chemical dependency plans for withdrawal, he had a sharp mental decline and was ranting incoherently and hallucinating. Mr. Murray supposedly "refused" medication, although he was not competent then to do so given his mental state. Despite obvious

inability to consensually refuse medication, and his declining condition, Defendant Wellpath medical staff treated Mr. Murray as "refusing" and just being "in a mood," and refused to provide him any treatment. Deputies noticed shallow breathing and Mr. Murray told staff that he was having a seizure. Mr. Murray's alcohol withdrawal needs were recklessly under-assessed, and then Defendant Wellpath medical staff deliberately ignored his obvious change in condition and active decompensation until he died.

76.    Felicia Hudson died at the CJC on October 15, 2022. She had a clinical history of chronic obstructive pulmonary disease and chronic respiratory failure, requiring supplemental oxygen. During her intake screening on October 13, 2022, she reported to medical staff that she was supposed to use an oxygen concentrator at nighttime. She also reported that for the last three days, she had a productive cough and shortness of breath. Despite telling a nurse about her chronic conditions and serious symptoms, she was not provided any oxygen or escalated to a higher-level provider. She was found unresponsive in her cell at the CJC just two days later.

77.    On December 11, 2022, Savannah Poppell was found barely responsive in her cell in the CJC surrounded by copious amounts of vomit that looked like coffee-grounds — a telltale sign of internal bleeding. The dark vomit was on the floor, the walls, her bed, and all over her face. Ms. Poppell was withdrawing from opiates, which all medical staff know frequently involves significant vomiting and needs to be properly managed as it is potentially fatal. She was also a Type 1 diabetic and her insulin was totally unmanaged even in the very dangerous context of repeated vomiting of blood. Near the time of her death she was extremely hyperglycemic. The coroner concluded Ms. Poppell experienced such violent and prolonged vomiting from substance abuse withdrawal that she tore her esophagus, suffered a fatal upper gastrointestinal hemorrhage, and bled to death at the CJC.

**Defendants El Paso County, Roybal, and Wellpath deliberately failed to provide inmates at the CJC with their critical medication for financial (profit-driven) reasons, causing the violation of Mr. McLaney's rights.**

78.    During the time of and leading up to the violation of Mr. McLaney's constitutional rights, it was well known by Defendants El Paso County, Roybal, and Wellpath that there were serious staffing issues that caused a pattern and practice of deliberately indifferent medical care in the CJC, which included failing to provide critical medication to improve profits and reduce costs.

79.    These patterns and practices compelled the involved Defendant Wellpath staff to refuse to provide Mr. McLaney with his critical medication.

80.    Defendant Wellpath contracts with Defendant El Paso County to provide medical care and medication to inmates.

81.    Defendant Wellpath profited from its decision not to provide medication to inmates like Mr. McLaney at the CJC. Pursuant to its contract with Defendant El Paso County, Defendant Wellpath was paid the same regardless of whether or not it provided Mr. McLaney with his medication. This perverse economic incentive caused the violation of Mr. McLaney's constitutional rights.

82.    Defendant El Paso County profited from having Defendant Wellpath provide care at the CJC because Defendant Wellpath provided the lowest bid by a wide margin, and Defendants El Paso County and Robyal Knew that Defendant Wellpath could not provide adequate care for the cost of its bid. This perverse economic incentive caused the violation of Mr. McLaney's constitutional rights.

83.    Defendants El Paso County and Wellpath knew that the CJC inmates would require critical medication, including cancer medication like the life-saving oral TKI chemotherapy pill, scemblix.

84. Despite the well-known extensive needs of the CJC population, Defendants El Paso County and Wellpath refused to provide critical medication because of their cost.

**Defendant H.I.G. Capital owns and controls Defendant Wellpath, as well as Correct Care Solutions, Correctional Healthcare Companies, Correctional Medical Group Companies, and California Forensic Medical Group.**

85. At all relevant times, Defendant Wellpath was and is owned and controlled by Defendant H.I.G. Capital. Defendant Wellpath acts on behalf of Defendant H.I.G. Capital and Defendant H.I.G. Capital was and is responsible for the hiring, retaining, training, and supervising of the conduct, policies and practices of its employees and agents of Defendant Wellpath, including Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns.

86. Defendant H.I.G. Capital acquired California Forensic Medical Group ("CFMG") in 2013 and rebranded its name to Correctional Medical Group Companies ("CMGC") that same year. Defendant H.I.G. Capital is the owner, manager and partner of CFMG, now CMGC, which contracts to provide delivery of medical services to inmates and was and is responsible for the management, hiring, retaining, training, and supervising of the conduct, policies and practices, customs, standards, finances, of its employees, managers, supervisors, contractors, leaders in the service of providing medical care to prisoners, including Mr. McLaney.

87. On October 1, 2018, Defendant H.I.G. Capital announced that it had acquired Correct Care Solutions ("CCS") and merged it with CMGC. Previously, CCS had merged with Correctional Healthcare Companies ("CHC").

88. Defendant H.I.G. Capital renamed CCS and CFMG "Defendant Wellpath" in October 2018, for the purpose of carrying Defendant H.I.G. Capital's ownership and financial interests in providing jail mental and medical health care, and so that Defendant H.I.G. Capital may control the assets and reap the profits, while Defendant Wellpath assumes the liabilities.

25

89. Defendant Wellpath is estimated to generate $1.5 billion annually.

90. In an October 1, 2018, press release, a Managing Director of Defendant H.I.G. Capital, Mr. Wolfson, announced, "We are proud of what we have accomplished since partnering with CMGC in 2012, and excited to bring these two companies together." Mr. Wolfson further affirmatively stated, "[H.I.G. Capital] believe[s] we have combined the industry's two best management teams."

91. Defendant H.I.G. Capital knew that the provision of healthcare to individuals housed in local, state, and federal correctional facilities was a booming business. Defendant H.I.G. Capital decided to capitalize on this population.

92. Defendant H.I.G. Capital uses the corporate entity as a shield against liability and harm caused to the individuals in jails and prisons.

93. Treating Defendant H.I.G. Capital as a separate corporate entity that is not responsible for the acts of the various corporations under its ownership and control would promote injustice and defeat the rights of individuals such as Mr. McLaney. Additionally, it would enable Defendants Wellpath's and H.I.G. Capital's unconstitutional conduct, practices, customs and policies that harm this particularly vulnerable jail population, and discourage abatement of these unconstitutional actions and inactions.

94. Kip Hallman is President of Defendant Wellpath, which has merged CMGC (who owns CFMG) and CCS (known as CCS-CMGC). All of these companies are under the ownership, supervision, management, and direction of Defendant H.I.G. Capital. Mr. Hallman has the duty and responsibility for managing and overseeing all Defendant Wellpath medical delivery operations, including those at the CJC. Mr. Hallman is and was responsible for promulgation of

policies, procedures and allowance of the practices/customs pursuant to which the acts of Defendant H.I.G. Capital, Defendant Wellpath, and their employees and agents.

95.    The contract between Defendant El Paso County and Defendant Wellpath was signed by Mr. Hallman.

96.    Defendant H.I.G. Capital exercises sufficient control over Defendant Wellpath's activities such that Defendant Wellpath is an agent or instrumentality of Defendant H.I.G. Capital.

97.    Defendant H.I.G. Capital places its senior partner and/or members on the boards or managing bodies of Defendant Wellpath in order to maintain a high degree of day-to-day control over Defendant Wellpath's activities. Defendant H.I.G. Capital has seats on the board of Defendant Wellpath, and controls, manages, and approves major policy decisions of Defendant Wellpath. On Defendant Wellpath's website, it explicitly admits that Defendant H.I.G. Capital members are on Defendant Wellpath's Board of Directors. Michael Kuritzky was the Secretary and Chief Financial Officer of Defendant Wellpath, while serving as a Principal of Defendant H.I.G. Capital. Currently, he is a Managing Director for Defendant H.I.G. Capital and oversees the Advantage Fund, which includes Defendant Wellpath as a portfolio company. Justin Reyna was on the board of Defendant Wellpath, while serving as a Managing Director of Defendant H.I.G. Capital. He continues to serve as a Managing Director for Defendant H.I.G. Capital's Advantage Fund, which includes Defendant Wellpath as a portfolio company. Rob Wolfson is intimately involved with the day-to-day management of Defendant Wellpath as Executive Managing Director of Defendant H.I.G. Capital and Head of the H.I.G. Advantage Fund, which includes Defendant Wellpath as a portfolio company. He specifically oversees Defendant H.I.G.'s global healthcare efforts, which encompasses Defendant Wellpath.

98.     Defendant H.I.G. Capital acts through its employees, agents, directors, officers and is responsible for the acts of its employees, agents, directors, and officers performed within the scope of such agency. Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns.were acting on behalf of Defendant H.I.G. Capital (and Defendant Wellpath) and were and are agents of Defendant H.I.G. Capital, and therefore Defendant H.I.G. Capital (in addition to Defendant Wellpath) is responsible for their conduct as described in this complaint.

99.     Defendant Wellpath undertakes the provision of jail medical and mental health care with the understanding that Defendant H.I.G. Capital is the principal in control of those activities. Defendant H.I.G. Capital has authorized and in fact encouraged Defendant Wellpath to conduct those activities in a manner that jeopardizes the lives of inmates and Defendant H.I.G. Capital has or should have knowledge of all material facts about Defendant Wellpath's actions.

100.    Defendant H.I.G. Capital ratifies Defendant Wellpath's conduct by knowingly accepting the risks associated with contracting for the provision of jail medical services and mental health services. Despite knowledge of the unconstitutional actions and inactions causing harm to Colorado's inmates, Defendant Wellpath is Defendant H.I.G. Capital's twenty-third control investment in healthcare since 2008 and is its fourteenth current platform in the sector.

101.    The federal government, through a number of U.S. Senators, has considered Defendant Wellpath an agent of Defendant H.I.G. Capital when seeking to monitor Defendant Wellpath's activities and ensure that inmates are provided with appropriate care.

**Defendant Wellpath has a long history of providing deliberately indifferent care.**

102.    At the time of the events alleged herein, Defendant Wellpath was a national company with a disgraceful history of failing to provide constitutionally adequate medical care to inmates. Amid a focus on cost containment and massive corporate growth, the company has

provided egregiously substandard care that has caused avoidable deaths and other serious negative outcomes. An abundance of examples in Colorado and nationwide establish that Defendant Wellpath, and its predecessor companies are deliberately indifferent in their policies, customs, and practices related to the medical needs and constitutional rights of inmates.

103.    Defendant Wellpath previously operated in Colorado and nationwide as CCS. In its request for proposal for the contract at the CJC, Defendant Wellpath admitted that it previously had done business as CCS. As alleged, the re-branding under the name Wellpath was undertaken to escape the names associated with these companies that have a long, sordid history of providing constitutionally deficient care to inmates — but the company's deficient care remains the same, no matter how many times Defendant Wellpath changes its name.

104.    Defendant Wellpath and its predecessor companies repeatedly relied on inexperienced workers, offered minimal training, and understaffed facilities. Across the country, staff acting on behalf of Defendant Wellpath have consistently failed to diagnose and monitor life-threatening illnesses and chronic diseases and denied urgent transfers to higher-level care. Defendant Wellpath consistently allows common conditions in jails to become fatal.

105.    Defendant Wellpath's founder and CEO of its predecessor company CCS, Gerard Francis "Jerry" Boyle, pleaded guilty in 2021 to federal bribery charges after he bribed a Norfolk County Sheriff in a pay-to-play scheme. Yet, as recently as May 2019, Defendant Wellpath called Boyle a "visionary" founder, noting that the company had "adopted his management philosophy as our company's values."

### Defendant Wellpath has been found liable for providing customary deliberately indifferent care by multiple governmental entities, experts, and former employees.

106.    Various governmental institutions have repeatedly made extensive reports of constitutional deficiencies in the care provided by Defendant Wellpath and its predecessor

companies. A number of these reports noted chronic understaffing by Defendant Wellpath and its predecessor companies. The policies, customs, and practices, along with the lack of training and staffing, that led to the issuance of the below-outlined reports are the exact same as those that caused the violations of Mr. McLaney's rights at the CJC.

107. Defendant Wellpath-predecessor CFMG also had a long history of providing deliberately indifferent care. Over a 10-year period ending in 2014, people in custody at California county jails serviced by CFMG died of suicide or drug overdose at a rate about 50 percent higher than at other county jails when adjusted for population, and a total of 92 people died of suicide or a drug overdose. CFMG's contracts created an incentive to limit costs because the counties paid CFMG a set amount, regardless of how many doctor visits or prescriptions were needed. At one point, company co-founder Dr. Taylor Fithian wrote a letter to one of his employees expressing concern that inmates were making too many emergency room visits and hospitalizations. About 20 percent of the inmates in jails where CFMG provided care were identified as having mental health needs in 2013. Yet the company contracted to have a psychiatrist on site no more than nine hours a week, with an average of less than five minutes of in-person psychiatric care each week, in the jails. The abject lack of mental health care provided by Defendant Wellpath-predecessor CFMG constituted deliberate indifference to inmates' medical needs.

108. In one example, an expert examined the Monterey County jail where CFMG provided care and reviewed three suicides there. In each case, he found that problems with CFMG's mental health and suicide prevention programs appeared to have contributed to the suicides. CFMG failed to provide inmates medicine or psychiatric consultation prior to their deaths. In another example, in Ventura County Jail, an inmate had a history of mental illness severe enough that he was once ruled incompetent to stand trial and a CFMG psychiatrist and other

employees were aware of his condition. A federal judge found that the CFMG officials were responsible for the inmate "receiving no treatment for his mental health condition in the three months prior to his suicide and grossly insufficient monitoring, and thereby contributed to his death." The inmate committed suicide in 2009 and his lawsuit related to the deficient care provided by CFMG settled for $775,000.

109.    At the Pierce County Jail in Washington state, where ConMed (another predecessor company to Defendant Wellpath) was contracted to provide medical and mental health care, county officials found that the medical unit was chronically understaffed. The doctor could rarely be reached on the phone in a timely manner, if at all, at the facility. Within the first couple of months of the county's 2014 contract with ConMed, officials began to catalogue serious issues with the lack of care, including inmates frequently going without critical medication, employees being escorted out of the jail after county officials discovered they weren't licensed to practice in the state, some of the medical unit's written policies appearing to have been copied and pasted from another facility (one page directed employees to report cases of sexual assault by calling an emergency room 1,500 miles away in Minnehaha County, South Dakota), and inmate requests found stuffed in a drawer in a completely different area of the jail, nowhere near the main clinic, where they should have been filed. After more than a year, Pierce County ultimately withheld four months of payments, amounting to nearly $1.5 million. When the county determined that CCS hadn't resolved the issues it cited, officials terminated the contract — later calling the company's performance morally reprehensible. CCS sued Pierce County in an attempt to get paid, alleging the agency was in breach of contract. The county countersued, saying it hadn't received the services it had been promised. A jury ruled in Pierce County's favor in March of 2019, with the county receiving a final judgment of nearly $2 million (including interest).

110.    In a 2015 federal contract audit of the Reeves County Detention Center in Texas, where one of Defendant Wellpath's predecessors was contracted, the United States Department of Justice ("DOJ") found that there may have been a "potential financial incentive" for the company to leave positions vacant — as it did for 34 months of a 37 month period, because it was paid more for the required positions than it was forced to pay back for each it left unfilled.

111.    An official with the Texas Civil Commitment Office wrote in 2016 that the agency was extremely concerned with the lack of treatment being provided by CCS at a state facility. CCS was ultimately hit with $1.1 million in financial penalties during its roughly four-year contract, for citations ranging from instances of hiring unqualified mental health therapists to allowing referrals for necessary offsite visits to go unscheduled for months.

112.    After inspecting an immigrant detention center in Adelanto, California, where CCS was the medical and mental healthcare provider, a Department of Homeland Security watchdog found that detainees did not have timely access to proper medical care. According to the 2018 report, detainees said they had not been seen or received their critical medication for *months,* and doctors were indicating they had seen patients they did not actually visit.

113.    In a 2018 report investigating conditions at the Hampton Roads Regional Jail, the DOJ found that CCS provided constitutionally deficient mental health care to the people incarcerated at the jail. Specifically, the DOJ found that, among other failings, CCS failed to provide prisoners with their appropriately prescribed medication and proper medication management. Importantly, the DOJ observed that CCS provided inadequate mental health care due to understaffing and found the staffing level to be grossly inadequate. The report found that CCS knew about all of these gross deficiencies, particularly because of the suicide of multiple inmates, but consciously disregarded them and continued to provide constitutionally deficient mental

healthcare.

114.    In a 2021 DOJ report about the San Luis Obispo County Jail, where Defendant Wellpath provided medical and mental health services, the DOJ found reasonable cause to believe that the jail failed to provide constitutionally adequate medical and mental health care. The report concluded that Defendant Wellpath failed to provide adequate follow-up healthcare to inmates when necessary and, in fact, seemed to discourage routine follow-up healthcare. The DOJ reported systematic problems with medication management, including failure to provide critical medication at all and delay of critical medication. In San Luis Obispo County Jail, the Health Services Administrator reported that she assigned the psychiatrist 50% more patients per day than the psychiatrist felt comfortable seeing and that the psychiatric nurse practitioner reported that she sometimes had as many as 30 patients on her list per day even though she could only see between 10 and 1. The DOJ also noted in the report that Defendant Wellpath's health services administrator used a "popular meme" from the television show Downton Abbey to mock prisoner concerns as "whining" during a presentation made to jail leadership. The DOJ report included several specific example similar to Mr. McLaney's circumstances. This includes, in April 2019, discontinuation of the medication an inmate was prescribed and regularly given at an external psychiatric facility, causing deterioration. Another inmate had to wait eight days to speak with Defendant Wellpath staff, and another five days to receive prescribed medications. It was documented that, during this interim, the patient "articulated apparent delusions." Additionally, the report found that Defendant Wellpath knowingly provided inadequate staffing, which caused inadequate mental health care for inmates. Ultimately, the DOJ concluded that Defendant Wellpath knew about all of these gross deficiencies and the risks they posed to inmate health and safety, yet it simply ignored them. The report was shared with Defendant Wellpath, definitively placing it on notice of these deficiencies

in the care it was providing to inmates.

115.    In May 2022, a Defendant Wellpath-contracted psychiatrist resigned after six months following disagreements over the number of patients he was required to examine each week at a Norfolk, Virginia jail. The psychiatrist stated that he was asked to see a minimum of 50 patients per week in the nine hours he was contracted to work: an average of less than 11 minutes per appointment. The psychiatrist's Defendant Wellpath supervisor informed him that this caseload was actually a *reduction* from the schedule of the jail's previous psychiatrist, who saw up to 60 patients per week.

### A cascade of lawsuits demonstrates that Defendant Wellpath has been customarily deliberately indifferent to inmates like Mr. McLaney.

116.    Prior to its merger with Defendant Wellpath, CCS had been the subject of nearly 1,400 federal lawsuits. From 2014 until 2019, Defendant Wellpath and its predecessor companies were sued for causing more than 70 deaths. One county that terminated its contract after less than two years with one of Defendant Wellpath's predecessor companies called the company's performance morally reprehensible. Another said one the Defendant Wellpath predecessor company's failures had turned its jail into a sinking submarine. Former employees have resigned from Defendant Wellpath's predecessor companies because working for the companies put their licenses at risk. One employee stated that it was only concerned about the almighty dollar and would cut corners at any cost to patient care.

117.    Defendant Wellpath and its predecessor companies ignored obvious pleas for medication, denying inmates access to obviously necessary care. Such deficiencies are the custom, policy, and practice of Defendant Wellpath and its related entities.

118.    For example, in *Dence v. Defendant Wellpath, LLC*, No. 1:20-cv-00671-CL (D. Or. 2020), an inmate was booked into the Josephine County Jail with a known history of mental illness

and substance abuse. The inmate had a related prescription for medication. Without basis, Defendant Wellpath discontinued that medication within two weeks of her being in the jail. Moreover, the inmate did not receive any mental health care while in the jail and never saw a psychiatrist. She ultimately died by suicide in September of 2018 due to the unconstitutional lack of care provided by Defendant Wellpath. The deliberate indifference of Defendant Wellpath officials directly caused the her death, and led her family to file a lawsuit against Defendant Wellpath.

119.    In *Estate of Jesse Binam et al. v. Correct Care Solutions, LLC et al.*, No. 1:19-cv-02561-RM-GPG (D. Colo. 2019), an inmate died in the Mesa County Jail by suicide due to the deliberate indifference of CCS officials. That inmate, upon admission to the jail, informed CCS officials that he had medical and mental health conditions, including depression and seizures, and that he was taking medication for these. Despite this notice, the inmate was cut off all of his medication. As a result, the inmate made multiple calls threatening to kill himself, attempted suicide, and after attempting suicide, continued to tell jail officials he wished he were dead. Despite all of this, the inmate was then taken off suicide watch by CCS officials and placed into a cell by himself. The inmate died by suicide by hanging shortly thereafter. The deliberate indifference of CCS officials directly caused his death.

120.    In 2018, James Jarvis, a 60-year-old man, was incarcerated at the Mesa County Jail with current prescription medications for hypertension. Mr. Jarvis was denied his prescribed medication by CCS medical staff, and he became seriously ill in about a week. After days of vomiting, dizziness, and stumbling when he tried to walk, Mr. Jarvis complained to a nurse and was merely redirected, told to put in a grievance. His condition continued to deteriorate in front of the nurses' eyes, so much so that he could no longer move without assistance. This was captured

on video and reported to staff repeatedly. But for many days, multiple nurses on multiple shifts refused to send him to a hospital or even call a doctor. A nurse finally saw Mr. Jarvis *five days* after he submitted a grievance, by which time he could not walk and the left side of his face felt rubbery. Yet this nurse sent him back to his cell without performing any assessment and without contacting a higher-level nurse or doctor. Mr. Jarvis had suffered a stroke, and despite his obvious presentation of the classic, emergent symptoms of such a serious medical emergency, he was forced to wait for a scheduled appointment with a nurse before an ambulance was finally called. This indifferent cate caused Mr. Jarvis permanent injuries.

121.    In April 2017, Denny Lovern died of a heart attack at the Arapahoe County Detention Facility after CCS staff recklessly ignored his obvious emergent symptoms in the days leading up to his death. Despite Mr. Lovern's known history of cardiac issues and his prescription heart medication, plavix, CCS nurses failed to give Mr. Lovern his medication, plavix, because the facility did not presently have any and failed to promptly secure a supply. CCS nurses further ignored Mr. Lovern's reports of chest pains, presuming he was malingering, and "treated" this chest pain with an over-the-counter antacid. Despite repeated requests for help, Mr. Lovern's obvious and treatable cardiac emergency went untreated. He was never sent to the hospital, and he died on the floor of his cell. He was 59 years old.

122.    In *Henderson v. Gusman, et al.*, No. 2:17-cv-01916-MLCF-DEK (E.D. La. 2017), an inmate died by suicide in the Orleans Justice Center where CCS contracted to provide mental health care. The inmate suffered from bipolar disorder and paranoid schizophrenia and was taking related critical medication. He requested to be seen by a mental health professional shortly after being booked in the detention center because he had recently suffered a significant loss and had been depressed for at least two weeks. Despite his request, he was never seen by a mental health

professional. Less than a week later, he attempted suicide while in the shower by hanging himself from an exposed pipe that was a known suicide risk. The inmate died a few days later from his injuries. The deliberate indifference of CCS officials directly caused his death. His family brought a federal lawsuit and settled his claims against CCS for $575,000.

123.    In *Claypole v. County of San Mateo, et al.,* No. 5:14-cv-02730-BLF (N.D. Cal. 2014), an inmate committed suicide three days after being booked in the San Mateo County Jail. CFMG contracted to provide mental health care at the jail. The inmate noted during intake that he had been struggling with substance abuse, anxiety, panic disorders, and bipolar disorder since he was a teenager. The inmate also explicitly indicated that he had a treatment plan for his psychiatric care. While in court later, the inmate experienced a psychotic episode and asked CFMG for his medication. Despite all of this, CFMG officials did not place the inmate on suicide watch or provide him with any of his medication or other psychiatric treatment. The inmate died by suicide. The deliberate indifference of CFMG officials directly caused his death. After his death, his family brought a lawsuit against CFMG, which survived a motion to dismiss and later settled for $1,100,000.

124.    In *Estate of Beauford v. Mesa County, et al*., No. 1:13-cv-01080-RBJ-BNB (D. Colo. 2013), an inmate housed in Mesa County Detention Center died from multiple seizures when he was left unattended by doctors and mental health professionals who knew he was suffering. The inmate had multiple mental health disorders, severe intellectual disability, and epilepsy. CCS officials failed to ensure Mr. Beauford received his critical medications. He suffered seizure after seizure until he died. Judgement was entered against CCS for its negligent treatment of the inmate.

125.    In June of 2014, David Stojcevski, a 32-year-old, died from drug withdrawal symptoms after spending sixteen days at Michigan's Macomb County jail. When he was booked

for his 30-day sentence, Mr. Stojcevski informed CCS staff that he was in the process of treating his drug addiction and that he was taking methadone, benzodiazepines, and other opiate medication. However, CCS staff were deliberately indifferent to Mr. Stojcevski's need for ongoing critical medication and care while withdrawing. Mr. Stojcevski lost 44 pounds over sixteen days and died on the floor, naked and starving. Mr. Stojcevski's family sued, and CCS settled its part of the lawsuit for $1.3 million.

126.    In January 2018, Defendant Wellpath providers were deliberately indifferent to the serious medical needs of Kathleen Norman, causing her death. Ms. Norman was suffering the effects of alcohol detoxification while in custody at the Yamhill County Jail in Oregon. When she was admitted to the jail, Defendant Wellpath staff were aware of her condition and placed her in a medical cell on a detoxification protocol. Despite supposed medical monitoring, Defendant Wellpath staff allowed Ms. Norman to fall off her bed and lie face-down on the ground, alone, for an extended period of time, resulting in her death.

127.    Defendant Wellpath's deliberate indifference caused the in-custody death of Paul Bulthouse, a 39-year-old, in April 2019. Mr. Bulthouse died at the Muskegon County Jail after he suffered 15 seizures over a period of less than four hours due to alcohol and benzodiazepine detoxification. Mr. Bulthouse's severe symptoms, including hallucinations as well as seizures, were deliberately ignored and untreated by Defendant Wellpath staff. Defendant Wellpath staff failed to send Mr. Bulthouse to an off-site, higher-level provider despite the obviously severe symptoms of detoxification, and Mr. Bulthouse died alone in his cell.

128.    In 2013, a multi-plaintiff case was filed against CHC-related companies arising out of three deaths and one near death in the Tulsa County Jail resulting from inadequate medical care and refusals to obtain needed outpatient and emergent services for prisoners (*Revilla v. Stanley*

*Glanz, Sheriff of Tulsa County, et al.*, Case No. 4:13-cv-00315-JED-TLW (N.D. Okla.)). One plaintiff died due to bowel perforation and sepsis after medical staff refused to transport him to the hospital despite escalating and serious symptoms. Another died from a heart attack after complaints of chest pain were ignored for days without emergency transport. A third individual, who had a known history of cardiovascular problems, died after complaints of pain, nausea, and vomiting were ignored and emergency transportation, was denied. The incidents were caused by a longstanding policy, practice, or custom at the jail of Defendant Wellpath's predecessor companies (CCS, CHC, etc.) refusing to provide higher-level care or to send inmates with emergent needs to off-site hospitals, for purely financial (profit-driven) purposes.

129. In 2015, Scott Millward died in the Teton County, Wyoming jail. Mr. Millward was in the throes of a medical crisis from alcohol intoxication and withdrawal and also had persistent and critically high blood pressure. Despite this crisis and abnormal vital signs, CCS staff ignored abnormal vitals, did not take other required vitals, and did not administer Mr. Millward his required medication or give him sufficient doses. CCS did not take Mr. Millward to the off-site hospital, which was only minutes away. Mr. Millward appeared in court where the judge noted that he did not look well. Staff continued to fail to take his vitals and Mr. Millward ultimately died in his cell. Mr. Millward's autopsy concluded that he died of cardiovascular disease, including hypertension, and that "lack of antecedent medical care" was a contributing factor in his death. Mr. Millward was not administered needed medication, was not worked up despite serious symptoms and complaints, and instead was left to die.

130. Earl Williams died at the Tulsa County Jail in 2011 after he was known to have gone days without food or water. Mr. Williams' serious and known medical needs were ignored by CHC medical staff because there was an inappropriate "faking or malingering" diagnosis that

prevented him from receiving timely hospital care. Expressly concluding that he was faking paralysis, despite an injury to his head causing partial paralysis, the CHC nurses recklessly ignored Mr. Williams deteriorating and dehydrated status. Before he died, staff threw food at Mr. Williams and put water just outside his reach. Mr. Williams begged for water as he laid on the floor of his cell covered in his own waste. Mr. Williams' death was caused by Wellpath-related Defendants' maintaining a policy, practice, and/or custom of severely limiting off-site medical care, even in emergent situations, in deliberate disregard to the known, obvious, and excessive risks to the health of inmates. A lawsuit based on Mr. Williams' death resulted in a pretrial settlement against CHC (a predecessor or Defendant Wellpath) and jury verdict against the County in the amount of $10.25 million, which was affirmed on appeal to the Tenth Circuit Court of Appeals, *see Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), and was then settled for $10 million against Tulsa County, in addition to the separate pretrial settlement paid by CHC.

131.    Another death at Tulsa County Jail, of Gwendolyn Young, in 2013, resulted in an $82 million jury verdict against CHC. Ms. Young, who was in the jail for about five months before her death, frequently complained to CHC staff that she needed to go to a hospital. Two days before her death, she told staff she had been throwing up blood. Minutes before she died, she told a nurse she was having difficulty breathing and asked to go to the hospital. The nurse refused. The jury correctly found that Ms. Young's death was caused by CHC's deliberate indifference to her medical needs. From 2005 to 2014, while CHC was the healthcare provider at Tulsa County Jail, 28 deaths occurred at the jail. CHC's failure to take measures to address known deficiencies in its provision of medical care at the jail before Ms. Young's death contributed to the verdict.

132.    Eighteen-year-old Marc Moreno died in 2016 in Benton County Jail in Oregon, after CCS medical staff unconstitutionally denied him medical care despite his emergent

symptoms. Mr. Moreno was suffering from a known mental health crisis when he was detained, and he was observed by jail staff not eating or drinking for days. When a CCS nurse at the jail observed him, knowing that he had not had food or drink for four days at that point, she not only failed to contact a provider or send him off-site for emergency treatment, she also did not even take his vital signs. The next day, he was found dead in his cell; he had lost 38 pounds in the eight days he had been detained. After Mr. Moreno's family sued CCS, a court found that CCS had destroyed thousands of potentially incriminating documents in the case before they could be produced. Defendant Wellpath settled the lawsuit for $4.5 million dollars.

133.    Henry Clay Stewart died a preventable death from a perforated ulcer at Hampton Roads Regional Jail in Virginia in 2016 after seeking medical assistance from CCS staff for almost a month. He repeatedly alerted the CCS staff to his abdominal pain, blackouts, and inability to keep down food or water. Despite these emergent symptoms, CCS staff acted with deliberate indifference to his serious medical needs by refusing to send him off-site for care. A DOJ investigation found that there was reasonable cause to believe that the jail failed to provide inmates with constitutionally adequate medical care, citing Mr. Stewart's death, among several other deaths from lack of insufficient medical care, as evidence.

134.    Alisant Scott lost her breast to a mastectomy in 2016 after being detained in Oakland County Jail in Michigan, where CCS medical staff denied her obviously necessary evaluation and treatment in response to her complaints of agonizing pain due to a knot in her breast swelling to the size of a baseball. Ms. Scott pleaded with medical staff for help for two weeks before being forced to undergo the mastectomy, and the unconstitutional delay in adequate care and treatment was likely the reason she lost her breast and suffered weeks of excruciating pain.

135.    In 2016, 59-year-old Paul Clifton Jr. died in an Illinois jail after a jail sergeant who

was about to call an ambulance for him due to his difficulty breathing was told wrongly by CCS staff that his condition had improved and that it was unnecessary to send him out to an off-site. Even though Mr. Clifton's blood pressure remained dangerously high and he complained of chest pains, both very emergent symptoms, CCS staff refused to call an ambulance until he was unresponsive. Mr. Clifton's death was caused by CCS medical staff's deliberate indifference to his obvious and serious medical needs, as well as CCS's policy, custom, and/or practice of not or delaying obtaining obviously necessary off-site care for inmates.

136.    Jeffrey Lillis died at 37 years old at the Arapahoe County Detention Facility on December 14, 2014, as a result of deliberate indifference to his known serious medical needs by, among others, a CCS/CHC/CHM-contracted physician (CCS, CHC, and CHM are all Defendant Wellpath predecessor companies). Mr. Lillis died of sepsis and severe bacterial pneumonia, easily treatable conditions that would not have killed him had he been provided proper and timely medical treatment. Yet despite learning of the serious nature of his symptoms, the physician failed to timely order that Mr. Lillis be transported off-site for the necessary medical care, leading to Mr. Lillis's death. The state medical board later found that the doctor had acted below generally accepted standards of practice. A claim against the physician and CCS/CHC/CHM was settled by CCS/CHC/CHM for a confidential amount.

137.    In August of 2014, CHC-related defendants unconstitutionally caused the death of John Patrick Walter at the Fremont County Detention Center in Colorado by ignoring his obvious and serious medical condition. Mr. Walter's case involved CHC's denial of the prescription medication he had been taking before he was detained, and the reckless refusal to transport him to the hospital for necessary emergency treatment. He died on the floor of his cell, weighing 30 pounds less than when he was brought to the jail three weeks earlier. CCS and its related entities

settled a lawsuit based on Mr. Walter's death for $4.25 million.

138.    On December 14, 2014, a Colorado federal jury awarded an over $11 million dollar verdict against Defendant Wellpath predecessor company CHC and other defendants for failing to provide timely medical care to inmate Ken McGill in Jefferson County who was having a stroke. Nurses recklessly disregarded Mr. McGill's obvious and serious symptoms, did not call a doctor, did not send him to a hospital for appropriate care, and instead abandoned Mr. McGill while in the throes of a stroke for hours. The jury found that this Defendant Wellpath predecessor company had a pattern and practice of not providing timely medical care and allowing nurses to practice outside their scope in treating inmates, awarding millions of dollars in punitive damages for these deliberately indifferent customs, policies, and practices.

139.    In 2012, CCS medical staff ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell in Wichita County Jail in Kansas. CCS staff recklessly failed to transport her to the hospital for safe delivery of her child. When delivered, the baby was purplish and in need of medical attention, yet CCS staff did not take steps to resuscitate the newborn or administer CPR. The baby was pronounced dead shortly after birth.

140.    In 2009, Charles Holdstock died after the medical staff of a CCS-related company at Oklahoma County Jail ignored lab results that Mr. Holdstock's kidneys were not functioning properly (and were failing to eliminate the toxic build-up of his heart medication). Instead, jail medical providers acted with deliberate indifference by waiting to take Mr. Holdstock to the hospital despite the alarming test results and related emergent symptoms. Mr. Holdstock was found unresponsive on his cell floor and later died in a hospital emergency room.

141.    Since Mr. McLaney's mistreatment, Defendant El Paso County has terminated its contract with Defendant Wellpath.

**Defendants El Paso County's and Roybal's decision to enter into and maintain a contract with Defendant Wellpath further demonstrates their own deliberate indifference to the constitutional rights of people in custody at the CJC.**

142.    As discussed, Defendant El Paso County has longstanding and widespread customs, policies, and practices of taking a constitutionally infirm approach to inmates' medical care based on the conduct of its own employees, along with the conduct of the private medical providers and its staff, with whom it has contracted.

143.    For well over a decade, at least, Defendant El Paso County has tolerated and condoned the provision of medical care at the CJC that fails to comply with the mandates of the United States and Colorado Constitutions.

144.    Defendants El Paso County and Roybal have tolerated and condoned Defendant Wellpath's deliberately indifferent approach to medical care since the effective date of Defendant Wellpath's contract, and previously with other medical care companies, including well before the events underlying Mr. McLaney's case.

145.    The use of private companies, and the respective contracts shifting various costs between counties and private companies encourages cost reduction and discourages proper care. The for-profit motive contributes significantly to the development of widespread practices, policies, and training that cause deliberate indifference to serious medical needs, including the dis-incentivization of the necessary staff to evaluate emergent symptoms and ensure provision of necessary medication.

146.    From 2016 to 2018, jails relying on one of the five leading jail healthcare contractors, including Defendant Wellpath and its predecessor companies, had higher death rates than facilities where medical services were run by government agencies. Privately run health care providers had death rates that were 18 to 58 percent higher than those of public providers.

147.    Moreover, Defendants El Paso County and Roybal, in contracting with Defendant Wellpath to provide medical care at the CJC, knew or should have known of Defendant Wellpath's specific and significant history of serious deficiencies in providing medical services and care to inmates, as well as Defendant Wellpath's refusals to correct such deliberately indifferent customs, policies, and practices.

148.    The previous Defendant El Paso County Sheriff Bill Elder testified in 2021 that he had concerns about Defendant Wellpath's care due to "for-profit business model" having "systemic' problems." He further testified that providing adequate medical staffing was a consistent problem under Defendant Wellpath. In August 2020, then-Sheriff Elder was quoted in Denver's 5280 magazine, about for-profit jail medical contractors like Defendant Wellpath as saying "They're in it for the money, … They will do necessary operations, but if they can increase their net, they'll do it…. What happens if a nursing job comes open and they don't fill it immediately, or ever? Those dollars go directly to the bottom line."

149.    Defendants El Paso County and Roybal oversaw the implementation of the contract with Defendant Wellpath. Defendants El Paso County and Roybal were aware of the contractual provisions that caused the customarily deficient medical care, training, and policies at the CJC, but did nothing to address these issues. Defendants El Paso County and Roybal continued to allow Defendant Wellpath to violate the constitutional rights of inmates pursuant to the explicit terms of their contract with Defendant Wellpath.

150.    Defendants El Paso County and Roybal are liable for the selection and ongoing retention of Defendant Wellpath to provide medical services at the CJC despite such knowledge of their longstanding and widespread custom, policies, and practices of providing constitutionally inadequate medical care to jail inmates at correctional and detention facilities with whom they

have contracted.

151.    The contract between Defendant El Paso County and Defendant Wellpath included financial incentives for providing less, and deficient, care. Part of the contract between Defendants El Paso County and Wellpath was an aggregate cap program aimed at reducing hospital visits and pharmacy costs for inmates. This directly led to a financial incentive to not provide inmates, like Mr. McLaney, with prescription medication and, particularly, costly prescription medication.

152.    Per the contract between Defendants Wellpath and El Paso County, Defendant El Paso County had the authority to fine Defendant Wellpath if it failed to meet the clinical standards outlined in the contract. Upon information and belief, neither Defendant El Paso County nor Defendant Roybal ever fined Defendant Wellpath for its mistreatment of Mr. McLaney.

153.    This demonstrates Defendants El Paso County's and Roybal's deliberate indifference to the health and safety of CJC inmates, given what it knew to be Defendant Wellpath's history of constitutionally inadequate medical care in correctional and detention facilities.

### Defendants El Paso County's, Roybal's, and Wellpath's customs, policies, and practices are deliberately indifferent to inmate's medical needs and predictably caused the violation of Mr. McLaney's rights.

154.    Defendants El Paso County, Roybal, and Wellpath customarily fail to provide critical medication to inmates within the CJC. The customs, policies, and practices of failing to provide critical medication to inmates was and is longstanding and widespread at the CJC.

155.    These customs, policies, and practices compelled the Individual Defendants to fail to provide Mr. McLaney with his critical medication.

156.    Defendant Wellpath knew that the failure to adequately serve the CJC would lead to serious injuries but nevertheless underserved the CJC to increase its profits — callously treating injury to inmates as the cost of doing business.

157.    Defendants El Paso County and Roybal knew that Defendant Wellpath unjustifiably underserved inmates at the CJC. Despite this knowledge, Defendants El Paso County and Roybal willfully and/or recklessly disregarded the obvious and known risk to inmates' safety in not ameliorating such risk.

158.    Defendants El Paso County's, Roybal's, and Wellpath's underservice of inmates caused the violation of Mr. McLaney's rights and his injuries.

### Defendant El Paso County is also liable for the conduct of Defendant Wellpath and its agents and/or employees based on its non-delegable constitutional duty to provide constitutionally adequate medical care at the CJC.

159.    Defendant El Paso County also had and has a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees. Defendant El Paso County failed to comply with its constitutional duty when (among other things), Defendant Wellpath and its agents and/or employees failed to provide Mr. McLaney the timely care that he needed to treat his serious medical condition, pursuant to the company's constitutionally infirm customs, policies, and practices.

160.    Defendant El Paso County intentionally delegated final policy making authority related to the provision of medical care in its jail to a third party — namely, Defendant Wellpath and its agents and/or employees. Nevertheless, the liability for providing constitutionally deficient medical care to pretrial detainees is not delegable, and remains both with Defendant El Paso County and Defendant Roybal.

161.    Defendant El Paso County is therefore liable for the unconstitutional actions of Defendant Wellpath and its agents and/or employees, including its defective customs, policies, and practices described herein, which were the moving force behind the violations of Mr. McLaney's constitutional rights.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Deliberately Indifferent Medical Care and Treatment**
*Against All Defendants*

162.    Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

163.    At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

164.    Defendants are persons under 42 U.S.C. § 1983.

165.    At all times relevant to the allegations in this Complaint, Defendants knew of Plaintiff's life-threatening medical condition.

166.    With deliberate indifference to Plaintiff's constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants knowingly failed to adequately examine, treat, monitor, supervise, and/or care for Plaintiff's life-threatening medical condition. They did so despite their knowledge of Plaintiff's serious medical needs, thereby placing him at risk of serious harm. Therefore, Defendants knew or were aware that Plaintiff faced a substantial risk of serious harm and disregarded this substantial risk by failing to take any measures to reduce it.

167.    In particular, when Plaintiff repeatedly alerted Defendants to his CMS, and repeatedly implored Defendants to provide him his critical medication, Defendants acted with

deliberate indifference to Plaintiff's obviously serious medical need and constitutional rights by failing to provide his medication to him.

168.    All of the deliberately indifferent acts of each Individual Defendant were conducted within the scope of their official duties and employment.

169.    Plaintiff had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to his known serious medical needs.

170.    Each Individual Defendant knew or should have known of this clearly established right at the time of Plaintiff's incarceration.

171.    At all times relevant to the allegations in this Complaint, the Individual Defendants were acting pursuant to Defendants El Paso County's, Roybal's, and/or Wellpath's customs, policies, practices, and/or training in their actions and inactions pertaining to Plaintiff.

172.    At all times relevant, Defendants El Paso County and Wellpath were willful participants in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates, including Plaintiff.

173.    Defendants El Paso County's, Roybal's, and/or Wellpath's deliberately indifferent and unconstitutional policies, customs, and/or practices regarding provision of constitutionally inadequate medical care as described herein were the moving and proximate cause of Plaintiff's injuries.

174.    Defendants El Paso County, Roybal, and Wellpath were deliberately indifferent in their failure to properly train and supervise their employees to provide necessary medical care to detainees at the CJC.

175.    The failures in training, supervision, and/or policy regarding providing necessary medical assessment and care were so obvious that the failure to provide medical care was deliberately indifferent to Plaintiff's rights.

176.    Defendant Roybal had a duty to train and supervise sheriff's deputies and Defendant Wellpath staff at the CJC to ensure that they were providing proper medical care to inmates and that inmates were receiving critical medication.

177.    Defendant Roybal failed to discharge this duty.

178.    Defendants El Paso County, Roybal, and Wellpath acted recklessly, intentionally and with deliberate indifference to Plaintiff's obvious, serious medical needs in failing to adequately staff the CJC, so as to provide proper medical care and monitoring to inmates, including by providing critical medication to inmates, and/or adequately train and supervise personnel in meeting the health care needs of inmates.

179.    Defendant El Paso County had a non-delegable duty to provide care to inmates, like Plaintiff, at the CJC.

180.    Defendants' actions and inactions were the legal and proximate cause of Plaintiff's injuries.

181.    The intentional actions and inactions of each Defendant as described herein deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the U.S. Constitution, and caused Plaintiff damages, including compensatory, economic, consequential, special, and emotional damages.

182.    Plaintiff is entitled to punitive damages against the Individual Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 20 or Colo. Const. Art. II, Section 25**
**Inadequate Medical Care and Treatment**
*Against Defendant Deputies*

183.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

184.    At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

185.    Defendant Deputies are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

186.    At all times relevant to the allegations in this Complaint, Defendant Deputies knew of Plaintiff's CML, which was a life-threatening medical condition.

187.    With deliberate indifference to Plaintiff's constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States and Colorado Constitutions, Defendant Deputies knowingly failed to adequately examine, treat, monitor, supervise, and/or care for Plaintiff's CML. They did so despite their knowledge of Plaintiff's serious medical needs, thereby placing him at risk of serious physical harm. Therefore, Defendant Deputies knew or were aware that Plaintiff faced a substantial risk of serious harm and disregarded this substantial risk by failing to take any measures to reduce it.

188.    In particular, when Plaintiff repeatedly alerted Defendant Deputies to his CML, and implored each of them to provide him his medication, Defendant Deputies acted with deliberate indifference to Plaintiff's obviously serious medical need and constitutional rights by failing to provide his medication.

189.    All of the deliberately indifferent acts of Defendant Deputies were conducted within the scope of their official duties and employment.

51

190.    Plaintiff had a clearly established right under the Colorado Constitution to be free from deliberate indifference to his known serious medical needs.

191.    Defendant Deputies are not entitled to qualified immunity under C.R.S. § 13-21-131.

192.    Defendant Deputies knew or should have known of this clearly established right at the time of Plaintiff's incarceration.

193.    At all times relevant to the allegations in this Complaint, Defendant Deputies were acting pursuant to Defendants El Paso County's, Roybal's, and/or Wellpath's customs, policies, practices, and/or training in their actions and inactions pertaining to Plaintiff.

194.    At all times relevant Defendants El Paso County and Wellpath were willful participants in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates, including Plaintiff.

195.    Defendant Roybal had a duty to train and supervise sheriff's deputies and Defendant Wellpath staff at the CJC to ensure that they were providing proper medical care to inmates and that inmates were receiving critical medication.

196.    Defendant Roybal failed to discharge this duty.

197.    Defendant Roybal's deliberately indifferent and unconstitutional policies, customs, and/or practices regarding provision of constitutionally inadequate medical care as described herein were the moving and proximate cause of Plaintiff's injuries.

198.    Defendant Roybal was deliberately indifferent in his failure to properly train and supervise employees to provide necessary medical care to detainees at the CJC.

199.    The failures in training, supervision, and policy regarding providing necessary medical assessment and care were so obvious that the failure to provide medical assessment and care was deliberately indifferent to the rights of Plaintiff.

200.    Defendant Roybal acted recklessly, intentionally and with deliberate indifference to Plaintiff's obvious, serious medical needs in failing to adequately serve the CJC, provide proper medical care and monitoring to inmates, provide critical medication to inmates, and/or adequately train and supervise personnel in meeting the healthcare needs of inmates.

201.    Defendants' actions and/or inactions were the legal and proximate cause of Plaintiff's injuries.

202.    The actions and inactions of Defendant Deputies caused Plaintiff damages in that he suffered extreme physical and mental pain.

203.    The intentional actions and inactions of Defendant Deputies as described herein deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the U.S. Constitution, and caused Plaintiff damages, including compensatory, economic, consequential, and special damages.

204.    Plaintiff is entitled to punitive damages against Defendant Deputies, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**THIRD CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-201 *et seq.***
**Negligence[2]**
*Against Defendants Wellpath, Santini, Lupo, Roche, Decker, Carroll, and Dobyns*

---

[2] Although not required, Plaintiff hereby gives notice that he may seek to amend the Complaint to add punitive damages against these Defendants because the injuries complained of are attended by circumstances of fraud, malice, or willful and wanton conduct.

205.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

206.    At all times relevant to this action, Plaintiff was under the medical responsibility, care, and treatment of Defendant Wellpath's staff, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns.

207.    Defendant Wellpath's staff, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, Dobyns, had a duty to provide medical care to inmates at the CJC, including Plaintiff.

208.    Defendant Wellpath's staff who interacted with Mr. McLaney during his incarceration at the CJC, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns, had physician-patient or nurse-patient relationships with Plaintiff, and at all times relevant were acting within the scope of their employment and special relationship with Plaintiff.

209.    Defendant Wellpath's staff, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns, owed Mr. McLaney a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical and mental health professionals in similar situations.

210.    Through their actions and inactions, Defendant Wellpath's staff, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns breached their standards of care and were negligent in failing to properly assess, monitor, treat, and care for Plaintiff.

211.    These duties of care are informed by state law. Under Colo. Rev. Stat. § 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food,

shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

212.    The negligent actions and inactions of Defendant Wellpath's staff, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns were a substantial and significant contributing proximate cause of Plaintiff's injuries.

213.    As a direct and proximate result of the actions, inactions, and violations alleged above, Plaintiff has suffered damages, including compensatory, economic, consequential, emotional, and special damages.

**FOURTH CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-201** *et seq.*
**Negligent Supervision and Training**[3]
*Against Defendant Wellpath*

214.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

215.    Defendant Wellpath is a private corporation that contracts to provide medical and mental health services to inmates at the CJC.

216.    As a private "person," not governmental actor, Defendant Wellpath is not entitled to any immunity under the CGIA.

217.    Defendant Wellpath is vicariously liable for the negligent acts and omissions by its agents and/or employees whether or not they are defendants to this claim.

218.    Defendant Wellpath is directly liable for its own negligent failures in training, supervision, staffing, policies, and practice.

---

[3] Although not required, Plaintiff hereby gives notice that he may seek to amend the Complaint to add punitive damages against these Defendants because the injuries complained of are attended by circumstances of fraud, malice, or willful and wanton conduct.

219.    At all times relevant to this action, Plaintiff was under the medical responsibility, care, and treatment of Defendant Wellpath and its agents and/or employees.

220.    Defendant Wellpath had a duty to provide medical care to detainees and inmates at the CJC, including Plaintiff.

221.    Defendant Wellpath's staff, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns, who interacted with Plaintiff during his incarceration at the CJC had doctor-patient or nurse-patient relationships with Plaintiff, and at all times relevant were acting within the scope of their employment and special relationship with Plaintiff.

222.    Defendant Wellpath's staff, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns, owed Plaintiff a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical professionals in similar situations.

223.    Through its actions and inactions, Defendant Wellpath's staff, including but not limited to Defendants Santini, Lupo, Roche, Decker, Carroll, and Dobyns, breached their standards of care and were negligent in failing to properly assess, monitor, treat, and care for Plaintiff.

224.    These duties of care are informed by state law. Under Colo. Rev. Stat. § 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

225.    Defendant Wellpath had a duty to exercise reasonable care in the training and supervision of its staff; a duty to reasonably staff the correctional and detention facilities where it contracted to provide medical care; and a duty to develop and implement reasonable policies and practices in support thereof.

226. Defendant Wellpath breached these duties by failing to reasonably train its staff.

227. The negligent actions and inactions by Defendant Wellpath and its staff were a substantial and significant contributing proximate cause of Plaintiff's injuries.

228. As a direct and proximate result of the actions, inactions, and violations alleged above, Plaintiff suffered damages, including compensatory, economic, consequential, and special damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

    a. Declaratory relief and injunctive relief, as appropriate;

    b. Actual economic damages as established at trial;

    c. Compensatory damages;

    d. Non-economic damages, including emotional distress damages;

    e. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

    f. Issuance of an Order mandating appropriate equitable relief, including but not limited to:

        i. Issuance of a formal written apology from each Defendant to Plaintiff;

        ii. The imposition of policy changes designed to avoid future similar misconduct by Defendants; and

        iii. Mandatory training designed to avoid future similar misconduct by Defendants;

    g. Pre-judgment and post-judgment interest at the highest lawful rate;

    h. Attorney's fees and costs; and

   i. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 13th day of March 2025.

        Newman | McNulty, LLC

        *s/ Madeline Leibin*
        Mari Newman
        Andy McNulty
        Madeline Leibin
        1490 Lafayette Street, Suite 304
        Denver, CO 80218
        (720) 850 - 5770
        mari@newman-mcnulty.com
        andy@newman-mcnulty.com
        madeline@newman-mcnulty.com

        Attorneys For Plaintiff